Clinton Bridge & Iron Works vs. First National Bank of Darlington.

CLINTON BRIDGE & IRON WORKS, Appellant, vs. THE FIRST NATIONAL BANK OF DARLINGTON, imp., Respondent.

*April 10 — April 25, 1899.*

*Partnership: Restriction on equality of rights: Contracts: Interpleader: Interest.*

1. Plaintiff, a manufacturer of iron bridges, and C. entered into the business of-taking contracts for and building bridges in designated territory. Among other things it was provided by the written memorandum constituting their contract that each was to contribute to the business a measure of capital and labor; the manufacturer was to supply the manufactured iron, and also its skill and labor in preparing plans and specifications and estimates of cost, and to aid, if required, in erecting the bridges; C. was to furnish all other material, the hired labor necessary for its transportation and erection, and his own labor in attending biddings, soliciting and closing contracts, and in erecting the bridges. The contracts were to be taken at not less than a fair percentage of profit added to estimated cost, to be made payable to the manufacturer, and sent it for acceptance. Each had a practical veto upon the taking of contracts. After charging up at cost all material and labor the balance of the proceeds was to be divided equally between them, but no provision was made for the sharing of losses. *Held,* that the agreement constituted them partners in the business in which they were engaged.

2. In this agreement there was no restriction on equality of rights as between the partners, except that all contracts should be taken in the manufacturer's name, and be payable to it or its order. Before the commencement of the action C. received from a town an order, payable to plaintiff by name, for the price of a bridge erected under their agreement, which he indorsed to the defendant bank. Action being brought by the manufacturer against the town on the con-

118    SUPREME COURT OF WISCONSIN.    [103

Clinton Bridge & Iron Works vs. First National Bank of Darlington.

tract for the erection of the bridge, the bank was interpleaded and the money due from the town paid into court. *Held,* that under their agreement C. was not restricted in the right to collect indebtedness and to exercise the ordinary powers of a partner over joint assets; that the delivery to him of the town order was a compliance with the bridge contract; that the transfer of the order to defendant bank was effective; and that payment thereof to the bank would discharge the debt sued on.

3. In addition to ordering the money in court paid over to the bank, the court also gave judgment in favor of the bank, and against plaintiff, for the interest which would have been earned by such money between the time of its deposit and the rendition of judgment. *Held,* that such part of the judgment was erroneous.

APPEAL from a judgment of the circuit court for La Fayette county: GEO. CLEMENTSON, Circuit Judge. *Modified and affirmed.*

In April, 1895, plaintiff was a manufacturer of iron bridges. One H. W. Curry applied to it for an arrangement to act for or with it in contracting for and putting up bridges in certain counties in this state, and an interview was had, at which an agreement was reached and put in the form of a letter to Curry, substantially as follows: "That we will get you up papers for you to bid on bridges in Lafayette county, Green county, and Iowa county, Wis., and furnish you with estimates of costs and prices you can take the work at, for us to furnish the iron, and you do the erecting and furnish other material, you to do your own advertising, and furnish us with data on any bridges you want to bid on in the above-named counties, and we will get up papers accordingly, and furnish the iron and assist you in erecting, if necessary. Contracts to be taken in our name and not at a less price than a fair percentage of profit added to the estimated cost. We will furnish iron at a cost made before you bid on the work, and, at the time we furnish you with plans, etc., to bid on, according to data furnished by you.  .  .  . We will divide the profits equally with you, after all items of cost have been charged to the different contracts you may

take, and vouchers furnished us showing that all bills in connection with the same have been paid. All contracts to be made payable to the *Clinton Bridge & Iron Works*, or our order. Trusting you may be successful in getting a goodly amount of work, with a nice profit in it for us both. When any work comes up let us know, we will get papers ready for you, by you sending us the required information; that is, the size and kind of bridges wanted, kind of founda-tion, height of substructure, and length of spans, width of roadway, capacity required, etc., kind of lumber and cost of same at bridge site, distance from railroad station, and your estimated cost of erection. The cost of iron will vary accord-ing to the size and kind of work; but we will make it at cost in all cases, and shall demand the same from you on what labor and material you furnish. Contracts must be sent to us, as soon as made, for our acceptance."

Curry immediately went to work, in pursuance of this let-ter, and in the course of the season contracted for and erected several bridges, of which two in the town of Benton, at the price of $1,100, were the last, and were completed in Oc-tober of that year. About August of the same year, bridges for the town of Shullsburg, erected under this arrangement, had been completed, and in September payment was made therefor in two orders,— one of $2,100, and another of $300, payable, upon their face, to Curry. The $300 order was re-tained and cashed by him, and the $2,100 order was indorsed and sent to the plaintiff, all without any objection or protest on its part. It does not appear exactly what proportion the cost of the material furnished by the plaintiff bore to the material furnished and labor hired by Curry in these bridges, except that in the two in Benton Curry's cost was about $300; which must have been approximately one third of their entire cost. After the bridges for the town of Benton were completed, to wit, on November 1st, the plaintiff wrote to the town chairman requesting that, upon completion and

acceptance of the bridges, a town order should be made out for $953, in favor of the *Clinton Bridge & Iron Works*, payable to their order and expressed to them, and gave verbal direction to the same effect, all without the knowledge or approval of Curry.   On November 4th, the town of Benton issued a town order for $953, payable to the plaintiff or order, and delivered it to H. W. Curry, who on November 22d discounted the same with the defendant, the *First National Bank of Darlington*, indorsing the same, " *Clinton Bridge & Iron Company*, H. W. Curry, Agent." Before purchasing the order, the cashier of the defendant inquired of Curry as to his authority to indorse the order and transfer the debt, and was informed by Curry that he was a partner with the plaintiff in the construction of these bridges by virtue of a written contract embodied in a letter, and, as such, had authority to collect and discount this order, and that he needed the money for the uses of the business in which he and the plaintiff were partners.   He had not the letter with him, but the cashier of the bank, being acquainted with him, accepted the order upon his statement; he promising to exhibit such contract of partnership, and a few days thereafter he did bring the letter quoted above, and delivered it to the cashier.   At that time no accounting had been had between him and the bridge company, and he claimed, and still claims, that, after receiving the $953, there is still a balance of some $250 due him from the plaintiff.

The plaintiff sued the town of Benton on the contract made in its name for $953 and interest.   The town paid the money into court, and on its application the defendant bank was interpleaded and at once answered, setting up its right to the debt sued for by virtue of the assignment of the town order to it by Curry, claiming that he had the right to do so.   The case was tried without a jury, and the court held that a partnership existed between the plaintiff and Curry, as a result of which he had the power to receive this order

from the town, and to transfer the debt evidenced thereby, and adjudged that the money deposited in court be paid to the bank, and also rendered personal judgment in favor of the defendant, against the plaintiff, for $13.83 interest on the sum deposited from time of deposit to date of judgment. The plaintiff appealed to this court from that judgment, and gave undertaking to stay the same.

For the appellant there was a brief by *P. H. Conley* and *Calvert Spensley*, and oral argument by *Mr. Spensley*.

For the respondent there was a brief by *Orton & Osborn,* and oral argument by *P. A. Orton.*

DODGE, J. The issue of law joined by counsel in this court is a simple one, namely, whether or not the relations between Curry and the plaintiff were those of copartnership *inter sese*, so that the acts of Curry in receiving this town order and in transferring it to the bank were effective. That agreement, expressed in the letter quoted, seems to embody all the elements of a partnership. The plaintiff and Curry entered into the business of taking contracts and building bridges in three counties in southwestern Wisconsin. To that business each was to contribute a measure of capital and each a measure of labor. The plaintiff was to supply the manufactured iron to form the bridge. It was also to supply its skill and labor in preparing the necessary specifications of the structure, and the estimates of the cost thereof, and to aid, if required, in erecting the bridge. Curry was to furnish all other material, such as lumber, paint, possible stone abutments, and also the hired labor necessary for the transportation and erection of the bridge. He was also to contribute his labor in soliciting contracts, in attending upon the bidding and closing the contracts, and in erecting the bridges. Each member of the combination had a practical veto upon the taking of any contracts. The plaintiff was to estimate the cost of its part of the material and name a

price at which it was willing to have contract made, and Curry was restricted from entering into any contract without a fair margin of prospective profit above that estimated cost. On the other hand, Curry was to have control of making the bids and closing the contracts. The agreement further provided that, after charging up at cost all of said material, the balance, which would obviously be net profit, should be equally divided between them; the plaintiff having furnished the greater amount of money and the lesser amount of labor, and Curry the lesser amount of money and greater amount of labor. This seems to be a distinct joining of capital and labor on both sides for mutual profit.

It is urged that there is no provision in the contract for the sharing of losses, indeed, that the contract attempts to prohibit the possibility of losses. But the express mention of the sharing of losses in a contract of partnership is by no means necessary, and indeed such omission is by no means infrequent. Parties entering into partnership, especially for a limited purpose or period such as this was, usually do so in the contemplation that there are only to be profits and not losses,— a result not uniformly attained. Obviously, however, the rate or amount of profit on different contracts might vary, and it might well be that where a contract covered several bridges, as some of theirs apparently did, there might be loss upon one bridge to be made up by profits on others, or, as in case of all kinds of business, mistakes of judgment might have been made or unforeseen obstacles or burdens encountered, as well as failure to obtain payments, so that net loss, instead of net profit, upon the season's business might have resulted. In such an event, that loss must have been shared between the parties. The contract certainly does not give to either the right to reimbursement of the money contributed by him in advance of the other, and doubtless if loss had occurred the plaintiff would have insisted on its being shared, and would have resisted

any demand by Curry that he be reimbursed in full his expenditure out of the moneys received, if thereby a deficit were imposed upon the plaintiff.  *Upham v. Hewitt*, 42 Wis. 85, is much like the present case.

If a partnership was created, the indebtedness due for bridges built belonged to the two as partners, and the rights of each to collect or dispose of the same were equal, unless restricted by the terms of the partnership contract, which, of course, might place such limitations upon the ordinary rights of either partner as were seen fit. In the contract in question, the only restrictions on equality of rights consist in the provision that all contracts should be taken in the name of the plaintiff, and should be payable to the plaintiff or its order. It is not specified that the plaintiff only shall have the right to demand and receive payment; nor is Curry expressly cut off from his ordinary partner's right in that respect. The inference from the provision that the contract should be, in terms, payable to the plaintiff, that it was intended by the parties that payment should only be made to the plaintiff, is plausible, but not irresistible. It may have been merely an adoption of the plaintiff's name as a partnership name for the purpose of dignifying or advertising it through the community, or for some other purpose. That it was not intended to exclude Curry from receiving payment, nor from exercising ordinary partnership powers and ownership over the indebtedness arising to the two, is strongly indicated by their conduct in reference to the first substantial transaction,— that with the town of Shullsburg, at the completion of which payment was made by town orders payable to Curry, one of which he exercised the right to dispose of without calling forth any word of protest from the plaintiff. Without urging such transaction as in any way an estoppel against the plaintiff, it is cogent as a practical construction between the two parties to this partnership

contract of its meaning between themselves upon a subject as to which it was ambiguous, to say the most for the plaintiff's position.

The conclusion reached by the trial court was correct that a partnership was created between the plaintiff and Curry, and that Curry was not, by the agreement of partnership, restricted in the right to collect indebtedness and to exercise the ordinary powers of a partner over the joint assets; that the delivery to him by the town of the town order was a compliance with the bridge contract; that the transfer of the debt to the defendant bank was effective; and that upon payment of that order to the bank the town will have fully paid the debt sued on.   In view of this conclusion, the action of the court in making the order of interpleader of which plaintiff complains is wholly without prejudice to it.   It has no right to recover against either the town or the defendant, and therefore cannot complain of the judgment entered, and we need discuss neither the appealability of the order, the regularity of the appeal therefrom, nor whether any error was committed in making it.   Stats. 1898, sec. 2829.

One of the assignments of error is well taken, however. The town, upon the order of interpleader, paid into court all that was then due, including interest from the maturity of the warrant to the date of deposit.   The judgment orders that amount to be paid over to the defendant bank, but it also gives judgment in favor of the defendant bank and against the plaintiff for the interest which would have been earned by that amount between the time of its deposit and the rendition of judgment.   This was excepted to, and is assigned as error.   It is difficult to conceive upon what theory the plaintiff could be liable for this interest while the litigation was in progress.   It was not responsible for the interpleader.   It had sued the town, and, if it had recovered, might properly have recovered interest up to the

time of the judgment; but, failing to recover, would be liable only for costs. This part of the judgment is erroneous, and should be eliminated.

*By the Court.*—The judgment of the circuit court is modified by striking therefrom as of its date the sum of $13$\frac{83}{100}$, and, as so modified, is affirmed. Neither party will recover costs in this court, but the appellant will pay the clerk's fees.